# EXHIBIT A



# AFFIDAVIT OF SERVICE

**State of Georgia**                    **County of Fulton**                    **Superior Court**

Case Number: 2012CV217167

Plaintiff:
**Christopher Cox, on behalf of himself and all others similarly situated,**
vs.
Defendant:
**Stone Ridge at Vinings, LLC; The Connor Group a Real Estate Investment Firm, LLC; and Heartland Regional Power Company,**

> FILED IN OFFICE
> JUL 1 0 2012
> DEPUTY CLERK SUPERIOR COURT
> FULTON COUNTY, GA

Received by Investigative Services of Tampa on the 28th day of June, 2012 at 4:00 pm to be served on **Heartland Regional Power Company C/O CT Corporation System, 1201 Peachtree Street, N.E., Suite 1240, Atlanta, GA 30361.**

I, EDMOND J. BYER, being duly sworn, depose and say that on the **29th day of June, 2012** at **12:17 pm, I:**

Served a **CORPORATION** by delivering a true copy of the **Summons and Class Action Complaint and Exhibits** to **Pattie Hardy C/O CT Corporation System as Service of Process Specialist** for **Heartland Regional Power Company,** at the address of: **1201 Peachtree Street, N.E., Suite 1240, Atlanta, GA 30361,** and informed said person of the contents therein.

**Description** of Person Served:  Age: 40s,  Sex: F,  Race/Skin Color: Black,  Height: 5'5",  Weight: 150,  Hair: Black, Glasses: Y

I certify that I reside in the State of Georgia, am over the age of 18, have no interest in the above action and all statements above are true.  I am permanently appointed to serve process for Fulton County Superior Court.

Subscribed and sworn before me on the 2nd day of July, 2012

NOTARY PUBLIC

> CHERYL L. NUQUI
> NOTARY
> EXPIRES
> GEORGIA
> APRIL 11, 2016
> PUBLIC
> FAYETTE COUNTY

**EDMOND J. BYER**
Process Server

**Investigative Services of Tampa**
P.O. Box 272638
Tampa, FL 33688
(813) 964-9159

Our Job Serial Number: EJB-2012000270
Ref: 2012002301

Copyright © 1992-2011 Database Services, Inc. - Process Server's Toolbox V6.5h



## IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA

### 136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303
### SUMMONS

Christopher Cox, on behalf of himself and
all others similarly situated,

            **Plaintiff,**

vs.

Stone Ridge at Vinings, LLC; The Connor
Group a Real Estate Investment Firm, LLC;
and Heartland Regional Power Company
            **Defendant**

Case No.: _2012CV217167_

TO THE ABOVE NAMED DEFENDANT(S):

Your are hereby summoned and required to file with the Clerk of said Court and serve upon plaintiff's
attorney, whose name and address is:   Rachel L. Soffin, Esq.
                                        Georgia Bar #: 255074
                                        Florida Bar #: 0018054
                                        Morgan & Morgan, PA
                                        201 North Franklin Street, 7th Flr
                                        Tampa, Florida 33602

An answer to the complaint which is herewith served upon you, within 30 days after service of this

summons upon you, exclusive of the day of service. IF YOU FAIL TO DO SO, JUDGMENT BY

DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE

COMPLAINT.

This _____29_____ day of _June_____, 20 _12_

                                        Honorable Cathelene "Tina" Robinson
                                        Clerk of Superior Court

                                        By_____
                                                    Deputy Clerk

To defendant upon whom this petition is served:  Heartland Regional Power Company, I, LLC, by serving its reg

This copy of complaint and summons was served upon you:  agent:  C T Corporation System

                                        _____
                                                    Deputy Sherriff

Instructions: Attach addendum sheet for additional parties if needed, as in notation on this sheet if addendum is used

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

CHRISTOPHER COX, on behalf of himself
and all others similarly situated,

    *Plaintiff,*

v.

STONE RIDGE AT VININGS, LLC;
THE CONNOR GROUP, A REAL
ESTATE INVESTMENT FIRM, LLC;
and HEARTLAND REGIONAL
POWER COMPANY I, LLC.

    *Defendants.*

_____/

Civil Action File No:

CLASS ACTION COMPLAINT

JURY TRIAL

2012CV217167

**FILED IN OFFICE**
JUN 29 2012
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

## CLASS ACTION COMPLAINT

Plaintiff, CHRISTOPHER COX, on behalf of himself and all others similarly situated, by and through the undersigned counsel, brings this Class Action Complaint against Defendants, STONE RIDGE AT VININGS, LLC, THE CONNOR GROUP, A REAL ESTATE INVESTMENT FIRM, LLC, and HEARTLAND REGIONAL POWER COMPANY I, LLC, and in support thereof, alleges:

### NATURE OF THE CASE

1.    Plaintiff brings this class action on behalf of himself and all Residents of Stone Ridge at Vinings ("Stone Ridge"), a community owned and operated by The Connor Group, A Real Estate Investment Firm, LLC ("The Connor Group") with utility billing services provided by Heartland Regional Power Company I, LLC ("Heartland").

2.    The Connor Group, owned and operated by Larry S. Connor, markets itself as a real-estate investment firm that acquires so-called high-quality apartments, with the goal of reducing the cost of controllable expenses and selling the property for a profit.  In reality,

however, The Connor Group purchases distressed properties, such as Stone Ridge, and, rather than allocating the necessary resources to fixing the properties, it reduces costs by failing and refusing to make necessary repairs while continuing to promote its properties to consumers as luxury apartments.  As described herein, The Connor Group has failed to keep the apartments at Stone Ridge in good repair and free from uninhabitable conditions including severe mold, mildew, mice, rats, cockroaches and various other insects, water leaks, plumbing leaks, holes in walls and ceilings, and saturated and stained walls, ceilings and floors.

3.      Heartland Regional Power Company is a utility billing service provider for properties owned by The Connor Group, including Stone Ridge.  Similar to The Connor Group, Heartland is owned and operated by Larry S. Connor.  Upon information and belief, The Connor Group and Heartland have collaborated to increase profits at the expense of Stone Ridge residents by billing residents in excess of the amount charged by the local utility company (i.e. Georgia Power and Water or the City of Atlanta) for utility services, by inequitably distributing utility charges among residents in different sized units, and by failing to adequately disclose to residents the terms of the charges prior to residents signing the Leases.

4.      As a result of Defendants' deceptive conduct described herein, which has commonly affected residents residing in the 440-unit Stone Ridge apartment complex, Plaintiff and Class Members have lived in an unsafe and uninhabitable environment, and have suffered and incurred, and will continue to suffer and incur, damages and other losses.

5.      Plaintiff brings this action pursuant to O.C.G.A. §9-11-23 to recover injunctive relief and monetary relief, including damages and attorneys' fees.

2

## PARTIES

6.      Plaintiff, Christopher Cox, is an individual currently residing at Stone Ridge and has resided there since January 2008.

7.      Defendant, Stone Ridge at Vinings, LLC, is a Delaware Corporation with its principal place of business at 6485 Centerville Business Parkway, Centerville, Ohio 45459. The Stone Ridge at Vinings apartment complex is comprised of approximately 440 apartment units in multiple apartment buildings and is located at 3000, Cumberland, Dr., Atlanta, Georgia 30339. Stone Ridge at Vinings is owned and operated by The Connor Group.

8.      Defendant, The Connor Group, is an Ohio Corporation with its principal place of business at 6485 Centerville Business Parkway Centerville, Ohio 45459. The Connor Group owns and operates approximately 16,000 apartment units in seven markets, including Stone Ridge at Vinings. The Connor Group is owned by Larry S. Connor.

9.      Defendant, Heartland Regional Power Company, is an Ohio Corporation with its principal place of business at 6485 Centerville Business Parkway Centerville, Ohio 45459. Heartland is the utility billing service provider for properties owned by The Connor Group, including Stone Ridge. Residents at Stone Ridge, including Plaintiff and the Class, are billed by Heartland Regional Power Company for a variety of utility services, including, but not limited to, electric, water, sewage, trash and pest control. Heartland is owned and operated by Larry S. Connor.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over each of the Defendants pursuant to Georgia law because they transact business in, reside in or are citizens of the State of Georgia.

3

11.     This court possesses subject matter jurisdiction as to all claims asserted by Plaintiff and Class Members pursuant to O.C.G.A. §9-11-23.

12.     Venue is proper in this Court because one or more of the Defendants either resides in or maintains executive offices in this County, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this County, and Defendants have received substantial compensation by doing business and engaging in numerous activities that had an effect in this County.

## SUMMARY OF FACTS COMMON TO ALL CLAIMS

*The Connor Group and Stone Ridge*

13.     Stone Ridge at Vinings LLC and The Connor Group (collectively "Landlord" or "Defendants") are responsible for the management, maintenance and remediation of apartments offered for lease to the public.

14.     Plaintiff and the Class (as "Residents") entered into form lease agreements (the "Leases") with Landlord for residential apartments located at the Stone Ridge apartment complex. *See attached* Exhibit "A" (available portions of Plaintiff's 2010 and 2011 Leases with Defendant).

15.     Defendant, The Connor Group, owns and operates Stone Ridge.  The Connor Group is a real estate investment firm that purports to own and operate approximately 16,000 "luxury" apartment communities in seven markets, including Stone Ridge in Atlanta, Georgia. The Connor Group purports to have more than $1.3 billion in assets, to average 20% less per unit in controllable expenses than prior ownership, and to dramatically increase company revenues by, on average, increasing ancillary income (pet fees, deposits, late fees, etc.) at approximately

40% over prior ownership within the first two years after an acquisition. Its company philosophy is to acquire underperforming properties with a goal of repositioning them for sale or refinance within two to four years, and to reduce expenses and increase revenue.   This business model allows The Connor Group to reduce its expenses and increase its revenue by failing to allocate the proper resources toward renovating and remediating its apartments.

16.     In order to induce residents to lease apartments at Stone Ridge, Defendants represent to residents, prospective residents, and to the public, that they provide "luxury apartments" with floor plans that range from "cozy designer studios to palatial three bedrooms fit for a king and queen and their court," and that each "floor plan is professionally designed with quality, comfort and style being tantamount to the high standards of luxury we set." *See attached* compilation Exhibit "B" (webpages from the Stone Ridge website printed on June 20, 2012). As described herein, at all material times, Defendants knew these representations were untrue, but Defendants nevertheless continued to lease apartments to residents under the guise of luxury apartment living.

17.     Contrary to these representations, Stone Ridge is merely masquerading as a high end community when, in reality, the apartment complex is infested with mice, rats, cockroaches and various other insects of extraordinary size, commonly affecting residents throughout the 440-unit apartment complex. *See attached* Exhibit "C" (photograph of vermin in Plaintiff's apartment). Despite Defendants' knowledge of these unsafe and uninhabitable living conditions, and despite Defendants' monthly charge to residents for pest control, Defendants systemically fail to adequately respond to tenant complaints about these vermin infestations.

18.     The apartments at Stone Ridge are further plagued by severe mold, mildew, water leaks, plumbing leaks, brown faucet water, holes in walls and ceilings, and saturated and stained

5

walls, ceilings and floors. *See attached* compilation Exhibit "D" (photographs of mold, mildew, stained walls, ceilings and floors, and holes in walls and ceilings in Plaintiff's apartment). These conditions are rampant throughout the 440-unit apartment complex and commonly affect each apartment·building.

19.     Contamination resulting from water-damaged buildings can result in severe property damage and uninhabitable living conditions. Mold requires moisture to survive, and thus grows in damp or wet areas indoors. When excessive moisture is present in a building and the moisture problem is not addressed, various types of mold grow because molds flourish on wet building materials. Mold is preventable and results from improper care, maintenance and remediation. Stone Ridge has had, and continues to have, moisture and water intrusion, along with recurrent and chronic impaired indoor air quality that serves as breeding grounds for microbial growth.

20.     Upon information and belief, the presence of mold at Stone Ridge has resulted from still water due to improper drainage, rampant plumbing leaks, roof leaks and water leaks inside the apartments. The presence of mold has been further caused by Defendants' failure to properly inspect, clean, repair and maintain the apartments, and by Defendants' repeated and routine failure to adequately respond to tenant complaints about mold and moisture intrusions within their apartments.

21.     At all material times, Defendants knew or should have known of the uninhabitable conditions at Stone Ridge, including mice, rats, insects, severe mold, mildew, brown faucet water, water leaks, plumbing leaks, holes in walls and ceilings, and saturated and stained walls, ceilings and floors.

22.    At all material times, Defendants knew or should have known that these uninhabitable conditions were caused, at least in part, by improper drainage, plumbing leaks, roof leaks and water leaks inside the apartments, and inadequate pest control. Nonetheless, Defendants have failed to redress and to timely and adequately respond to tenant complaints regarding same and, as a result of this faulty maintenance, residents have been subjected to uninhabitable living conditions.

23.    At all material times, Defendants knew but failed to warn residents that uninhabitable living conditions pervaded Stone Ridge. Defendants' failure to repair has made the subject property unfit for human habitation, and the subject property cannot be restored to a fit condition without proper remediation.

24.    At all material times, Defendants have engaged in a practice of concealing the uninhabitable environmental conditions from residents. Defendants systemically conceal these conditions from tenants prior to tenants signing the Leases. In addition to showing tenants model units that do not contain these uninhabitable conditions, Defendants employees, including maintenance and management personnel, have been instructed to conceal the presence of mold within the apartment units, despite having direct knowledge of rampant mold throughout the subject property. Specifically, Defendants have instructed Stone Ridge personnel to make the apartments look clean and move-in ready and to cover up these conditions with only minimal and temporary repairs - such as a fresh coat of paint to conceal water damage on the walls and ceilings, rather than replacing the damaged drywall. Further, Defendants' employees, including management and maintenance personnel, have been instructed to place any work orders related to mold and vermin infestations at the bottom of their priorities.

7

25.     Despite having knowledge of significant water intrusion, mold, mildew and other infestations and uninhabitable living conditions in the subject property during the class period, Defendants have failed to sufficiently warn residents of these conditions.

26.     Despite having knowledge of significant water intrusion, mold, mildew and other infestations and uninhabitable living conditions in the subject property during the class period, Defendants continue to sign new leases and to renew existing leases with Plaintiff and Class Members.

27.     Despite having knowledge of significant water intrusion, mold, mildew and other infestations and uninhabitable living conditions in the subject property during the class period, Defendants have failed to implement an effective plan of remediation to eliminate the uninhabitable conditions existing in the subject property. Instead, as set forth above, Defendants have created, fostered and concealed these conditions at the subject property. Defendants continue to engage in such improper practices to this day.

28.     Despite having knowledge of significant water intrusion, mold, mildew and other infestations and uninhabitable living conditions in the subject property during the class period, Defendants have failed to respond to complaints from residents in a timely manner and Defendants have failed to correct or to make any attempt to adequately correct the problems. As a result, the subject property remains infested with mold, mildew, water leaks, plumbing leaks, brown faucet water, holes in walls and ceilings, and saturated and stained walls, ceilings and floors.

29.     Plaintiff and Class Members have suffered and incurred, and will continue to suffer and incur, significant property damage and other economic damages as a result of these uninhabitable environmental conditions.

30.     Plaintiff and Class Members have not received the benefit of their bargain, as they entered into Leases with Defendants for habitable properties free of uninhabitable conditions including mice, rats, insects, severe mold, mildew, brown faucet water, water leaks, plumbing leaks, holes in walls and ceilings, and saturated and stained walls, ceilings and floors.

31.     Further, Plaintiff's personal belongings have been destroyed by water intrusions, and by mold or bacteria, which grows (and has grown) on Plaintiff' personal possessions throughout the apartment.

### The Connor Group and Heartland Regional Power Company

32.     Defendant, The Connor Group, was founded by Larry S. Connor, who is also the Manager of Heartland Regional Power Company.  Heartland Regional Power Company is a utility billing service provider for Stone Ridge at Vinings.

33.     Heartland bills Stone Ridge residents for common electric, water, sewer, pest control and trash, and charges a monthly administrative fee of up to $9.99 for same.  Once a Resident provides payment to Heartland, the money is allegedly paid to The Connor Group, which, in turn, pays some portion of those proceeds to the local utility company (Georgia Power and Water or the City of Atlanta).

34.     Heartland provides utility billing services to bill back residents for utilities, such as common electric, water and sewage.  According to Heartland, this service is required when there is only one meter per building instead of a meter in the actual apartment unit to calculate each tenant's exact utility usage.  In this instance, in order to equitably distribute each resident's share of utilities, Heartland represents on its website that it bills for usage of water/sewage based on the square footage of the apartment and the days occupied in the apartment.  As a result,

according to Heartland, smaller units should have smaller bills. *See attached* Exhibit "E" (FAQs from Heartland's website printed on January 2, 2012).

35.     Contrary to this representation, upon information and belief, Heartland does not equitably distribute the utility usage.  Instead, it distributes the bills among residents so that smaller units are actually billed the same or similar amount as larger units.   In addition, upon information and belief, Defendants charge tenants more for utility usage than Defendants actually pay to the local utility provider (Georgia Power and Water or the City of Atlanta), thereby adding a markup to residents' utility bills and retaining excess monies paid by residents. Thus, the amount of the bill for an individual apartment unit exceeds the actual amount of utility usage.

36.     Heartland has advertised the "benefits" of its services as assisting apartment operators to "[r]educe monthly operating costs by increasing revenues, lowering costs, and helping to keep the focus on your core business," and to "[r]aise your property value substantially by recovering your utilities costs."  As described herein, upon information and belief, Heartland is able to achieve these benefits by deceptively inflating utility bills paid by residents, including Plaintiff and the Class, while representing to the public that its clients do not profit on their utilities.  *See attached* Exhibit "F" (home page from Heartland's website on March 2, 2011).

37.     Heartland also assesses monthly charges per unit for pest control, even though pest control is provided only upon request or once every three months, and the apartments remain infested with rats, mice, cockroaches and other insects of extraordinary size.

## NAMED PLAINTIFF'S FACTUAL ALLEGATIONS

38.    Mr. Cox executed a lease with Defendants for an apartment at Stone Ridge on October 14, 2010 for the period of January 21, 2011 to January 20, 2012, and again on January 20, 2012 for the period of January 21, 2012 to January 20, 2013.

39.    Mr. Cox first notified Stone Ridge Management of the presence of mold in his apartment in October 2010, at which time he observed a water leak within his apartment, leading to moisture within the walls, along with mold growing on the walls throughout his apartment, and particularly in his master bedroom.  Mr. Cox immediately informed management of these issues in his apartment.

40.    Approximately five months later, following multiple complaints and requests for repair of the leaks and mold covering the walls and carpet within his apartment, maintenance removed the drywall within Mr. Cox's master bedroom, which exposed the presence of significant moisture and mold engulfing the wood panels and insulation within the wall.  *See attached* compilation Exhibit "G" (photographs of exposed wall in Plaintiff's master bedroom). Despite Mr. Cox's multiple requests to Defendants for swift repair and remediation of the mold and mildew, and for replacement of the drywall removed by maintenance, Defendants did not replace the drywall within Mr. Cox's apartment for 16 days.  Further, despite Mr. Cox's multiple requests to Defendants for alternate accommodations during this 16 day period – including Mr. Cox's reference to the Lease allowing him to terminate same should the apartment remain uninhabitable for a period of ten (10) days, and his complaints to Defendants of being unable to sleep in his master bedroom due to a gaping hole in the wall, which further exposed the mold and which perpetuated the already present toxic odor – Defendants did not provide Mr. Cox with alternate accommodations.  Consequently, Mr. Cox lived with a large hole in his wall with

11

exposed wood and insulation saturated with mold and mildew for more than two weeks. Further, after repairing the drywall and allegedly removing the mold within the walls in Mr. Cox's master bedroom, the mold returned and has never been properly remediated despite Mr. Cox's continued complaints to Defendants about same.

41.    During the time that Defendants failed to remediate the uninhabitable levels of mold within Mr. Cox's apartment, Mr. Cox asked Defendants whether he should be concerned about the exposed mold from the large hole in the wall of his master bedroom. In response, Defendants told Mr. Cox that he should not be concerned, even though Defendants did not properly remediate the mold and even though Defendants had not conducted any testing regarding the extent of the mold intrusion.

42.    In addition to living with a large hole in the wall of his master bedroom with exposed mold, Mr. Cox's apartment is plagued with significant water leaks, brown faucet water, extraordinarily large insects, a constant foul odor and, most recently, a collapsed ceiling in his master bedroom, which has further exposed the rampant water leaks and mold that have inundated his apartment. *See attached* compilation Exhibit "H" (photograph of collapsed ceiling in Plaintiff's master bedroom).

43.    When Mr. Cox renewed his lease on January 20, 2012, he chose to do so following assurance from Stone Ridge management that it would take active steps to remove any uninhabitable conditions from his apartment, including the presence of extraordinarily large insects and mold, along with brown faucet water, foul odors and water leaks throughout his apartment. Despite these assurances, Defendants have not taken adequate action.

44.    To date, Defendants have failed to properly remediate the mold within Mr. Cox's apartment, and have failed to adequately repair the conditions causing brown faucet water, foul

odors, water leaks, and a collapsed ceiling in his bedroom that has further exposed the significant mold intrusion and water leaks in his apartment. Consequently and despite Mr. Cox's multiple complaints to Defendants of these conditions, Mr. Cox has lived in an unsafe environment, exposed to these uninhabitable conditions. Further, Mr. Cox's personal belongings, including clothing, shoes, books, a VCR and DVD player, have been destroyed.

45.     For the above reasons, Mr. Cox has not received the benefit of his bargain, as he entered into a Lease with Defendants for a habitable property free of mold, foul odors, holes in walls and ceilings, brown faucet water, rats, insects and other uninhabitable conditions, and he did not receive same.

46.     In addition to living in uninhabitable conditions, Defendants have deceptively imposed fees upon Mr. Cox for various services, including pest control, water, trash, sewage and electric, along with an administrative fee for same. As discussed herein, Defendant, Heartland Regional Power Company, which is owned and operated by Larry S. Connor - who also owns and operates The Connor Group and Stone Ridge - bills Stone Ridge Residents, including Mr. Cox, for utility services. Upon information and belief, this business arrangement was created to increase Defendants' income at the expense of residents.

47.     Along that vein, when Mr. Cox signed his Leases, Defendants failed to adequately disclose the terms of the utility charges before Mr. Cox signed the Lease. Specifically, Defendants failed to adequately notify Mr. Cox that he would be required to pay a "common electric" bill which is inequitably split among apartments in his building so that Mr. Cox - who lives in a two bedroom unit - is paying the same electric fee as those living in a three bedroom unit. Defendants have also deceptively imposed a monthly pest control fee upon Mr. Cox, as pest control is provided only upon request or once every three months, and his apartment remains

infested with insects, rats and other pests.  Further, upon information and belief, Defendants have billed Mr. Cox in excess of the amount charged by the utility companies, and have earned a profit as a result of same.

## CLASS ALLEGATIONS

48.    Plaintiff brings this action as a class action on behalf of himself and all others similarly situated for the purpose of asserting claims alleged in this complaint on a common basis.

49.    Plaintiff brings this action as a class action pursuant to the provisions of *O.C.G.A. § 9-11-23(a), (b)(2) and (b)(3)* for damages, injunctive and declaratory relief, and relief incident and subordinate thereto, including costs.

50.    Plaintiff proposes to act as a representative of the following proposed class:

> **All Residents who reside in or occupy, or have resided in or occupied, an apartment unit at Stone Ridge at Vinings, from June, 2008 to present.**

51.    The identities of the individual members of the Class are ascertainable through, among other things, Defendants' internal records.

52.    The class is so numerous that joinder of individual members herein is impracticable and would involve hundreds, if not thousands, of individual actions.

53.    Common questions of law and fact exist and predominate over any issues affecting only individual Class Members.  Common issues of law and fact include, but are not limited to:

a.    Whether Landlords entered into the Leases with Plaintiff and the Class;

14

b.      Whether Landlords breached the Leases with Plaintiff and the Class by failing to maintain the premises;

c.      Whether Landlords breached the Leases with Plaintiff and the Class by failing to timely and adequately respond to complaints from Plaintiff and the Class about the uninhabitable living conditions described herein;

d.      Whether Defendants failed to timely and adequately repair or remediate these uninhabitable conditions;

e.      Whether Defendants failure to remediate caused or exacerbated these uninhabitable environmental conditions;

f.      Whether Defendants knew or should have known that Stone Ridge is contaminated with these uninhabitable conditions;

g.      Whether Defendants failed to warn Plaintiff and the Class that Stone Ridge is contaminated with these uninhabitable conditions;

h.      Whether Defendants acted negligently in connection with the Lease of apartments to Plaintiff and the Class;

i.      Whether Defendants negligently managed the Stone Ridge apartment complex in such a manner as to permit the development of these uninhabitable living conditions, which caused damage to the personal property of Plaintiff and the Class;

j.      Whether Defendants breached the implied warranty of habitability owed to Residents under O.C.G.A. § 44-7-13 and O.C.G.A. § 44-7-14.

k.      Whether Defendants acts or practices were in violation of the Georgia Deceptive and Unfair Trade Practices Act, O.C.G.A. §§ 10-1-372 and 10-1-373(a)).

l.      Whether Plaintiff and the Class have suffered property damage as a result of Defendants' negligence;

m.      Whether Plaintiff and the Class received the benefit of their bargain when they entered into the Leases;

n.      Whether Plaintiff and the Class are entitled to rental reimbursement for Defendants' failure to maintain the premises;

o.      Whether Defendants improperly and inequitably billed Plaintiff and the Class for utility services and administrative fees;

p.      Whether Defendants failed to provide Plaintiff and the Class with adequate notice of how the water bills would be calculated before signing the Leases pursuant to O.C.G.A. §12-5-180.1;

q.      Whether Defendants failed to provide Plaintiff and the Class with adequate notice of how and what utility fees are assessed;

r.      Whether Defendants' actions are the proximate cause of damages to Plaintiff and the Class; and

s.      Whether Defendants actions should be enjoined.

54.     Plaintiff's claims are typical of the claims of the proposed Class.  Each class member has sustained damages arising from Defendants' wrongful conduct of failing to maintain the subject premises and failing to disclose that the uninhabitable conditions described herein were a recurring problem on the subject premises.

55.     Plaintiff will fairly and adequately represent and protect the interests of the proposed Class. Plaintiff is committed to the vigorous prosecution of this action and Plaintiff does not have any interests antagonistic to those of the Class. Plaintiff has retained competent and experienced counsel in the prosecution of complex class action litigation.

56.     Defendants have acted, or refused to act, on grounds generally applicable to the Class by failing to maintain the subject premises and failing to disclose that the uninhabitable living conditions described herein were a recurring problem at the subject premises, thereby making injunctive or declaratory relief applicable with respect to the Class as a whole.

57.     Questions of law or fact common to Plaintiff and the class predominate over any question of law or fact affecting only individual members of the Class. A class action is also superior to other available methods for the fair and efficient adjudication of this controversy because Class Members number in the hundreds, if not thousands, and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class Members to prosecute their claims individually. Trial of Plaintiff's and Class Members' claims is manageable, and economies of time, effort, and expense will be fostered and uniformity of decisions will be insured.

58.     Prosecution of separate actions by or against individual members of the class would create risk of (a) inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendants or (b) adjudications with respect to individual members of the class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

59.    Most individual Class Members have little ability to prosecute an individual action due to the complexity of the issues involved in this litigation and the significant costs attendant to litigation on this scale compared to the damages suffered by individual Class Members.

60.    Unless a class is certified, Defendants will continue to unlawfully engage in acts of failing to maintain the subject premises and failing to disclose the uninhabitable conditions described herein.  Unless a class-wide injunction is issued, Defendants will continue to violate the law.

**COUNT I**
**(Breach of Contract)**
**(Stone Ridge and The Connor Group)**

61.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 60 as if fully set forth herein.

62.    Plaintiff and Defendants entered into form Leases for the subject property.  These leases are identical in all respects material and relevant to this action.

63.    Under the terms of the Leases, Defendants were required to maintain the premises in a safe and habitable condition, free from mice, rats, insects, mold, foul odors, water leaks, plumbing leaks, brown faucet water, holes in walls and ceilings, and saturated and stained walls, ceilings and floors.

64.    Defendants breached the Leases by the following:

a.    Failing or refusing to allow residents to terminate the Leases after apartments were made uninhabitable for more than ten (10) days as a result of mice, rats, insects, severe mold, water leaks, foul odors, plumbing leaks, brown faucet water, holes in walls and ceilings, and saturated and stained walls, ceilings and floors;

18

b.        Failing or refusing to make timely and necessary repairs with reasonable promptness after receipt of complaints from Plaintiff and the Class;

c.        Failing or refusing to maintain the premises in a safe and habitable condition by allowing the uninhabitable conditions of mice, rats, insects, severe mold, water leaks, foul odors, plumbing leaks, brown faucet water, holes in walls and ceilings, and saturated and stained walls, ceilings and floors in the premises where Plaintiff and the Class reside(d); and

d.        Failing or refusing to allocate the financial and labor resources necessary to maintain the premises and to remediate the uninhabitable conditions of mice, rats, insects, severe mold, foul odors, water leaks, plumbing leaks, brown faucet water, holes in walls and ceilings, and saturated and stained walls, ceilings and floors.

65.     Defendants further breached the Leases by threatening eviction proceedings against residents who have legally withheld rent because of Defendants conduct in violation of the Leases.

66.     As a result of Defendants' failure and refusal to remediate the uninhabitable conditions, Plaintiff and the class were forced to live with mice, rats, insects, severe mold, foul odors, water leaks, plumbing leaks, brown faucet water, holes in walls and ceilings, and saturated and stained walls, ceilings and floors.  These conditions did not result from the acts or omissions of any resident.

67.     As a direct and proximate result of Defendants' breach of the Leases and refusal and failure to maintain the premises in a safe and habitable condition for the duration of the Leases, Plaintiff and Class Members have suffered substantial monetary damages and losses. Such damages and losses include, but are not limited to, relocation costs and damages – such as

actual moving expenses from the subject property; storage and testing of personal property; rental deposits, where required; a dislocation allowance equal to the difference, if any, between the rent at the subject property and rent at a new, comparable residence; reimbursement of rent; the costs of replacing or restoring property damaged by water or exposure to mold; the need to have apartments, clothing and personal possessions professionally cleaned and inspected for the presence of harmful molds; replacement of clothing and personal possessions destroyed, or disposed of, as a result of the mold growth; moving or other expenses necessary or incidental to finding new apartments.

68.     Plaintiff, individually, and on behalf of all others similarly situated, respectfully requests judgment be entered in their favor, awarding compensatory damages, interest and costs, and such other relief as this Court deems just and proper.

**COUNT II**
(Negligence)
**(Stone Ridge and The Connor Group)**

69.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 60 as if fully set forth herein.

70.     As lessors, owners and managers of the subject property, who manage, control and oversee the condition of the subject property leased by Plaintiff and the Class, Defendants have a duty to exercise reasonable care, to maintain the premises in a habitable condition, and to repair and remedy any defective, dangerous, unsafe or uninhabitable conditions on the premises for the protection of Plaintiff and the Class.

71.     At all times material hereto, Defendants owned, operated, managed, or maintained the subject premises, appurtenances and fixtures thereto.

72.     At all times material hereto, Defendants had a duty to repair and maintain the

20

subject premises in good repair, free from uninhabitable conditions of severe mold, mildew, water leaks, foul odors, plumbing leaks, brown faucet water, holes in walls and ceilings, and saturated and stained walls, ceilings and floors.

73.    At all times material hereto, and consistent with the monthly pest control assessment, Defendants had a duty to keep the premises free from mice, rats, insects and other vermin infestations.

74.    At all times material hereto, the premises leased to Plaintiff and the Class were improperly maintained and repaired by Defendants or their agents.

75.    At all times material hereto, the premises leased to Plaintiff and the Class were exposed to, saturated and infiltrated by uninhabitable conditions of mice, rats, insects, severe mold, mildew, foul odors, water leaks, plumbing leaks, brown faucet water, holes in walls and ceilings, and saturated and stained walls, ceilings and floors.

76.    Defendants breached their duty of reasonable care by taking the following actions, including, but not limited to:

a.    Promoting the foreseeable development of uninhabitable conditions of mice, rats, insects, severe mold, mildew, foul odors, water leaks, plumbing leaks, brown water from the faucets, holes in walls and ceilings, and saturated and stained walls, ceilings and floors, by failing to repair and maintain the subject premises;

b.    Failing to inspect for uninhabitable conditions of mice, rats, insects, severe mold, mildew, foul odors, water leaks, plumbing leaks, brown water from the faucets, holes in walls and ceilings, and saturated and stained walls in and around the subject apartments, when Defendants knew or should have known that the environment in and around the apartments were conducive to the development of these uninhabitable

conditions; and

c.      Failing to adequately remediate uninhabitable conditions of mice, rats, insects, severe mold, mildew, foul odors, water leaks, plumbing leaks, brown water from the faucets, holes in walls and ceilings, and saturated and stained walls in and around the subject apartments, which Defendants knew or should have known existed;

77.      Despite Defendants' knowledge of the dangerous and uninhabitable condition of the premises, Defendants failed and refused to prevent and repair these conditions.

78.      Defendants' failure to maintain the buildings in a manner consistent with industry customs, practice and standards caused the unsafe and uninhabitable living conditions described herein.

79.      As a direct and proximate result of Defendants failure to remediate the existence of mice, rats, insects, severe mold, mildew, foul odors, water leaks, plumbing leaks, brown faucet water, holes in walls and ceilings, and saturated and stained walls, ceilings and floors, the apartments leased from Defendants by Plaintiff and the Class are in an uninhabitable condition.

80.      As a direct and proximate result of Defendants' failure to repair the uninhabitable conditions of the premises, Plaintiff and Class Members have suffered considerable and irreparable damage to personal property and are entitled to compensation for damages to same. Plaintiff and class members have been required, or will in the future be required, to correct, repair, replace, restore, dispose of, destroy or decontaminate their personal property due to Defendants' negligence described herein.   Plaintiff and class members are entitled to compensation for these damages, including, but not limited to, expenses to correct, repair, replace, restore, dispose of, destroy, or decontaminate household goods, furnishings and contents, as well as other personal property damaged or lost either as a direct result of the

uninhabitable conditions or by Defendants' failure to properly inspect, maintain and remediate the uninhabitable conditions.

81.     Plaintiff, individually, and on behalf of all others similarly situated, respectfully requests judgment be entered in their favor, awarding compensatory damages, interest and costs, and such other relief as this Court deems just and proper.

**COUNT III**
**(Negligent Misrepresentation)**
**(Stone Ridge and The Connor Group)**

82.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 60 as if fully set forth herein.

83.     In order to induce residents to lease apartments at Stone Ridge, Defendants negligently represent to residents, and continue to represent to the public, that they provide "luxury apartments" with floor plans that range from "cozy designer studios to palatial three bedrooms fit for a king and queen and their court," and that each "floor plan is professionally designed with quality, comfort and style being tantamount to the high standards of luxury we set." Contrary to these representations, Stone Ridge is merely masquerading as a luxury community when, in reality, it is infested with uninhabitable conditions including severe mold, mildew, foul odors, mice, rats, cockroaches and various other insects, water leaks, plumbing leaks, holes in walls and ceilings, and saturated and stained walls, ceilings and floors, none of which were or are disclosed to tenants prior to signing the Leases.

84.     At all material times, Defendants knew these representations were untrue, but Defendants nevertheless continued to lease apartments to residents under the guise of luxury apartment living.

85.     Defendants negligently supplied this false information to foreseeable persons,

23

known or unknown, including Plaintiff and the Class, for the purpose of inducing Plaintiff and the Class to enter into the Leases with Defendants.

86.    Plaintiff and the Class reasonably relied on Defendants' negligent misrepresentations to their detriment.

87.    Plaintiff and the Class have suffered, and continue to suffer, economic injury as a direct and proximate result of Defendants' unlawful conduct.

88.    Plaintiff and Class Members are entitled to recover from Defendants the damages incurred as a result of the activity complained of herein, including, but not limited to, relocation costs and damages – such as actual moving expenses from the subject property; storage and testing of personal property; rental deposits, where required; a dislocation allowance equal to the difference, if any, between the rent at the subject property and rent at a new, comparable residence; reimbursement of rent; the costs of replacing or restoring property damaged by water or exposure to mold; the need to have apartments, clothing and personal possessions professionally cleaned and inspected for the presence of harmful molds; replacement of clothing and personal possessions destroyed, or disposed of, as a result of the mold growth; moving or other expenses necessary or incidental to finding new apartments.

89.    Plaintiff, individually, and on behalf of all others similarly situated, respectfully requests judgment be entered in their favor, awarding compensatory damages, interest and costs, and such other relief as this Court deems just and proper.

## COUNT IV
### (Breach of Implied Warranty of Habitability)
### (Stone Ridge and The Connor Group)

90.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 60 as if fully set forth herein.

24

91.     This is an action for breach of implied warranty of habitability pursuant to O.C.G.A. § 44-7-13 and O.C.G.A. § 44-7-14.

92.     Under Georgia law, a Landlord is responsible for keeping the subject units in a safe and habitable condition and for maintaining the property and making any necessary repairs. In all residential leases, the landlord is responsible for maintaining the building structure and for keeping the rental property and its operational systems - such as the electric, heating, air conditioning, and plumbing - in good repair.

93.     A landlord's failure to repair a unit damaged by flooding or water leaks, or failure to remediate uninhabitable conditions including severe mold, mildew, foul odors, mice, rats, cockroaches and various other insects, brown faucet water, water leaks, plumbing leaks, holes in walls and ceilings, and saturated and stained walls, ceilings and floors, is a breach of the landlord's duty to the tenant to keep the unit in good repair, and can render residential apartment units uninhabitable.

94.     Plaintiff and Class Members entered into form Leases with Landlords for rental of the subject residential apartment units.

95.     These leases were subject to an implied warranty of habitability in accordance with O.C.G.A. § 44-7-13 and O.C.G.A. § 44-7-14, pursuant to which Defendants were under a duty to Plaintiff and Class Members to maintain the subject premises in a clean and safe condition fit for human occupation, to repair all dilapidation that may render the premises uninhabitable, and to comply with all applicable building, housing and health codes. These Leases also specifically stated that Landlords would make repairs with reasonable promptness upon receipt of notice from the tenant.

96.     Landlords breached their duty to maintain clean, safe and statutorily compliant rental properties by maintaining the premises in an unsanitary condition with mice, rats, insects,

severe mold, mildew, foul odors, brown faucet water, water leaks, plumbing leaks, holes in walls and ceilings, and saturated and stained walls, ceilings and floors;

97.   Landlords had actual or constructive knowledge of the presence of these uninhabitable conditions.

98.   Despite having notice of the dangerous and defective conditions, Landlords have failed or refused to repair and maintain the premises in a habitable, safe and sanitary condition.

99.   Landlords' failure to repair has made the subject apartments unfit for Plaintiff and the Class to live, and the units cannot be restored to a fit condition by ordinary repairs.

100.   The presence of mice, rats, insects, severe mold, mildew, foul odors, brown faucet water, water leaks, plumbing leaks, holes in walls and ceilings, and saturated and stained walls, ceilings and floors were not patent defects in existence, or apparent to Plaintiff and the Class, at the time of the commencement of the Leases.   Plaintiff and the Class had no knowledge of these conditions when they entered into the Leases, and these conditions could not reasonably have been discovered prior to commencement of the Leases.

101.   As a proximate result of Landlords' failure to maintain the premises in a condition free from the presence of mice, rats, insects, severe mold, mildew, foul odors, brown faucet water, water leaks, plumbing leaks, holes in walls and ceilings, and saturated and stained walls, ceilings and floors, and as a result of Landlords' failure to adequately repair these conditions, Defendants breached the warranty of habitability owed to Plaintiff and the Class pursuant to O.C.G.A. § 44-7-13 and O.C.G.A. § 44-7-14.

102.   Plaintiff, individually, and on behalf of all others similarly situated, respectfully requests judgment be entered in their favor, awarding compensatory damages, interest and costs, and such other relief as this Court deems just and proper.

**COUNT V**
(Georgia Uniform Deceptive Trade Practices Act)
(Stone Ridge and The Connor Group)

103.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 60 as if fully set forth herein.

104.    O.C.G.A. § 10-1-372 (hereinafter "UDTPA") is expressly intended to protect "persons" from potentially confusing or deceptive trade practices.

105.    Defendants are "persons" within the meaning of the UDTPA and, at all pertinent times, were subject to the requirements and proscriptions of the UDTPA with respect to all of their business and trade practices described herein.

106.    Plaintiff and Class Members are "persons" "likely to damaged" by Defendants' ongoing deceptive trade practices.

107.    Defendants violated the UDTPA by, *inter alia,* misrepresenting that the subject apartments and attendant services - including, but not limited to, maintenance and repair of the apartments and any uninhabitable conditions, and the functionality of necessities such as plumbing, heating and air conditioning - had characteristics, standards and quality that they did not, and by engaging in conduct which created a likelihood of confusion or misunderstanding regarding the quality and habitability of the apartments and attendant services that Defendants purported to provide to Residents.

108.    Defendants have further violated and continue to violate the UDTPA by engaging in the following deceptive acts and practices, in consumer transactions with Plaintiff and the Class:

    a.    concealing uninhabitable living conditions from residents, as described herein;

27

b.      failing to disclose, or failing to disclose adequately, the existence of these uninhabitable living conditions;

c.      failing to timely and adequately remediate these uninhabitable living conditions;

d.      representing that the apartments were habitable when they were uninhabitable and altered to conceal the uninhabitable living conditions described herein;

e.      representing that the apartments and attendant services were of a particular standard, quality, or grade - including "luxury apartments" with floor plans that range from "cozy designer studios to palatial three bedrooms fit for a king and queen and their court," and that each "floor plan is professionally designed with quality, comfort and style being tantamount to the high standards of luxury we set" – while Defendants merely masqueraded the apartments as a luxury community that, in reality, is infested with mice, rats, insects, severe mold, mildew, foul odors, brown faucet water, water leaks, plumbing leaks, holes in walls and ceilings, and saturated and stained walls, ceilings and floors; and

f.      representing and claiming in its advertisements, among other things, that it provides "luxury apartments" with floor plans that range from "cozy designer studios to palatial three bedrooms fit for a king and queen and their court," and that each "floor plan is professionally designed with quality, comfort and style being tantamount to the high standards of luxury we set," with the intent not to provide the apartments as advertised.

109.    Said conduct is generally and specifically within the meaning of Georgia's UDTPA and was and is illegal and unlawful. Defendants' failure to exercise reasonable care to

28

repair the unsanitary and unsafe conditions brought to its attention by Plaintiff and the Class rendered the premises uninhabitable and caused injury to Plaintiff and the Class.

110.   Plaintiff and the Class reserve the right to allege other violations of the law under the UDTPA as Defendants' conduct is ongoing.

111.   Plaintiff and Class Members have suffered ascertainable losses as a direct result of Defendants employment of unconscionable, unfair or deceptive acts or practices.

112.   Pursuant to the Georgia's UDTPA, Plaintiff and the Class are entitled to preliminary and permanent injunctive relief without proof of monetary damage, loss of profits, or intent to deceive.   Plaintiff and the Class seek equitable relief and to enjoin Defendants on the terms that the Court considers reasonable.

113.   Defendants' conduct caused and continues to cause substantial injury to Plaintiff and Class members.  Unless preliminary and permanent injunctive relief is granted, Plaintiff and the Class will suffer irreparable harm. Plaintiff and the Class do not have an adequate remedy at law. The balance of the equities weighs in favor of Plaintiff and the Class.

114.   At all material times, Defendants' deceptive trade practices were willful within the meaning of the UDTPA and, accordingly, Plaintiff and the Class are entitled to an award of attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT VI
### (Georgia Uniform Deceptive Trade Practices Act)
### (All Defendants)

115.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 60 as if fully set forth herein.

116.   O.C.G.A. § 10-1-372 (hereinafter "UDTPA") is expressly intended to protect "persons" from potentially confusing or deceptive trade practices.

117.   Defendants are "persons" within the meaning of the UDTPA and, at all pertinent times, were subject to the requirements and proscriptions of the UDTPA with respect to all of their business and trade practices described herein.

118.   Plaintiff and Class Members are "persons" "likely to damaged" by Defendants' ongoing deceptive trade practices.

119.   Under Georgia law, O.C.G.A. §12-5-180.1, "...the owner or operator of a building containing residential units may charge tenants separately for water and waste-water service, provided that the amount a landlord collects from each tenant shall not exceed the total charges paid by the owner or operator for water and waste-water service for such building, plus a reasonable fee for establishing, servicing, and billing for water and waste-water service and provided, further, that the terms of the charges are disclosed to tenants prior to any contractual agreement."

120.   Defendants violated the UDTPA by their failure to comply with this law when they billed Residents in excess of the amount charged by the city for utility services and when they failed to adequately disclose the terms of the utility charges before Residents signed the Leases, as described herein.  Defendants have made significant profits through these deceptive acts and practices and have created likelihood of confusion or of misunderstanding among Plaintiff and the Class.

121.   Defendants have further violated the UDTPA by, *inter alia,* Stone Ridge passing off the subject utility billing services as those of another, Heartland.  In reality, as described herein, both Heartland and Stone Ridge are owned and operated by Larry S. Connor and both Heartland and Stone Ridge profit from these utility billing services.  Upon information and belief, Defendants have collaborated to increase profits at the expense of Stone Ridge Residents.

Defendants have failed to adequately disclose this arrangement to tenants prior to signing the Leases and have caused likelihood of confusion or of misunderstanding regarding the affiliation, connection, or association between Stone Ridge and Heartland.

122.   In addition, Heartland advertises on its website that it provides utility billing services for communities, such as Stone Ridge, that have only one meter per building or one meter per community, in which case it bills back for usage of water/sewage based on the square footage of the apartment so that smaller units pay less for utility services than smaller units.  Heartland further advertises on its website that apartment communities, such as Stone Ridge, do not profit on their utilities.

123.   Contrary to these representations, upon information and belief,  Defendants have violated and continue to violate Georgia's UDTPA by engaging in the following deceptive acts and practices, in consumer transactions with Plaintiff and the Class, which has created a likelihood of confusion or of misunderstanding:

a.   billing Residents in excess of the amount charged by the city for utility services;

b.   inequitably distributing utility charges among Residents in different sized units;

c.   misrepresenting and claiming in their advertisements that Defendants do not profit from utility billing;

d.   misrepresenting and claiming in their advertisements that they equitably divide utility bills among Residents; and

e.   assessing monthly charges per unit for pest control, even though pest control is provided only upon request or once every three months, and the apartments remain infested with rats, mice, cockroaches and other insects.

31

124.    Said conduct is generally and specifically within the meaning of Georgia's UDTPA and was and is illegal and unlawful.

125.    Plaintiff and the Class reserve the right to allege other violations of the law under the UDTPA as Defendants' conduct is ongoing.

126.    Plaintiff and Class Members have suffered ascertainable losses as a direct result of Defendants employment of unconscionable, unfair or deceptive acts or practices.

127.    Pursuant to the Georgia's UDTPA, Plaintiff and the Class are entitled to preliminary and permanent injunctive relief without proof of monetary damage, loss of profits, or intent to deceive.   Plaintiff and the Class seek equitable relief and to enjoin Defendants on the terms that the Court considers reasonable.

128.    Defendants' conduct caused and continues to cause substantial injury to Plaintiff and Class members.  Unless preliminary and permanent injunctive relief is granted, Plaintiff and the Class will suffer irreparable harm. Plaintiff and the Class do not have an adequate remedy at law. The balance of the equities weighs in favor of Plaintiff and the Class.

129.    At all material times, Defendants' deceptive trade practices were willful within the meaning of the UDTPA and, accordingly, Plaintiff and the Class are entitled to an award of attorneys' fees, costs and other recoverable expenses of litigation.

**COUNT VII**
**(Unjust Enrichment)**
**(Stone Ridge and The Connor Group)**

130.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 60 as if fully set forth herein.

131.    Plaintiff and the Class have conferred a benefit upon Defendants.

132.    By their deceptive, misleading and unlawful conduct alleged herein, Defendants

32

have knowingly and unjustly received and retained a benefit conferred upon them by Plaintiff and Class Members.

133.   Under principles of equity and good conscience, Defendants should not be permitted to retain money belonging to Plaintiff and the Class that it unjustly received as result of its deceptive, misleading and unlawful conduct alleged herein without providing compensation to Plaintiff and Class Members.

134.   Plaintiff and the Class have suffered financial loss as a direct result of Defendant's conduct.

135.   By reason of having secured rental payments from Plaintiff and the Class without providing safe and habitable apartments or apartments worth the value of the rent due to the undisclosed and unsafe uninhabitable conditions described herein, and the costly financial and life altering changes necessitated thereby, Defendants have obtained and retained excess rents to their benefit and to the detriment and exclusion of Plaintiff and the Class, contrary to the fundamental principles of justice, equity and good conscience.

136.   Plaintiff, individually, and on behalf of all others similarly situated, respectfully requests judgment be entered in their favor, awarding equitable restitution, and such other relief as this Court deems just and proper.

### COUNT VIII
**(Unjust Enrichment)**
**(All Defendants)**

137.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 60 as if fully set forth herein.

138.   Plaintiff and the Class have conferred a benefit upon Defendant.

139.   By reason of having secured utility payments from Plaintiff and the Class in

excess of the amount charged by the utility provider, Defendants have obtained and retained excess funds to their benefit and to the detriment and exclusion of Plaintiff and the Class, contrary to the fundamental principles of justice, equity and good conscience.

140.   By their deceptive, misleading and unlawful conduct alleged herein, Defendants have knowingly and unjustly received and retained a benefit conferred upon them by Plaintiff and Class Members.

141.   Under principles of equity and good conscience, Defendants should not be permitted to retain money belonging to Plaintiff and the Class that it unjustly received as result of its deceptive, misleading and unlawful conduct alleged herein without providing compensation to Plaintiff and Class Members.

142.   Plaintiff and the Class have suffered financial loss as a direct result of Defendant's conduct.

143.   Plaintiff, individually, and on behalf of all others similarly situated, respectfully requests judgment be entered in their favor, awarding equitable restitution, and such other relief as this Court deems just and proper.

## RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants for themselves and the members of the Class as follows:

A.   Determining that the action is a proper class action and certifying an appropriate plaintiff class pursuant to O.C.G.A. §9-11-23;

B.   Declaring that Defendants have negligently caused economic injury to Plaintiff and Class Members;

C.   Declaring that Defendants have breached the Leases with Plaintiff and the Class;

D.   Declaring that Defendants have violated Georgia's UDTPA;

E.     Declaring that Defendants have breached the implied warranty of habitability;

F.     Declaring that Defendants have been unjustly enriched;

G.     Awarding Plaintiff and members of the Class their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

H.     Awarding restitution and disgorgement of Defendants revenues to Plaintiff and the proposed members of the Class;

I.     Awarding declaratory and injunctive relief as permitted by law or equity, including enjoining Defendants from leasing uninhabitable properties to consumers and requiring Defendants to remediate the properties, thereby making the properties habitable and free from uninhabitable conditions including mice, rats, insects, mold, mildew, foul odors, water leaks, plumbing leaks, brown faucet water, holes in walls and ceilings, and saturated and stained walls, ceilings and floors

J.     Awarding attorneys' fees and costs; and

K.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 21, 2012

Respectfully submitted,

RACHEL SOFFIN, ESQUIRE
Georgia Bar No. 255074
Florida Bar No. 0018054
J. ANDREW MEYER, ESQUIRE
Florida Bar No. 0056766
TAMRA GIVENS, ESQUIRE
Florida Bar No. 657638
MORGAN & MORGAN, P.A.
201 North Franklin Street, 7th Floor

35

Tampa, Florida  33602
Telephone:  (813) 223-5505
Facsimile:  (813) 222-4730
Email: ameyer@forthepeople.com
        tgivens@forthepeople.com
        rsoffin@forthepeople.com

JUSTIN D. MILLER, ESQUIRE
Georgia Bar No.  001307
MORGAN & MORGAN, P.A.
191 Peachtree St. NE, Suite 4200
Atlanta, GA 30303-1748
Telephone: (404) 965-8823
Facsimile: (404) 965-8812
Email:  jdmiller@forthepeople.com